FILED

2010 Jan-27  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

OTIS GIBSON, JR.,                      )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )   CIVIL ACTION NO. 09-G-0948-J
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

The plaintiff, Otis Gibson, Jr., brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security Benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations

omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth, at 1239.

## DISCUSSION

The court has carefully reviewed the record and finds that the decision of the ALJ must be remanded for further development of the record.  The plaintiff alleges he is disabled due to mental illness.  The medical records show that the plaintiff was treated at the Northwest Alabama Mental Health Center beginning May 9, 2006.  At that time he reported having "bad thoughts" with impulses to act on them.  He reported that he had gone into a rage the previous day that involved tearing up a door and beating on a wall. He was diagnosed with "Bipolar Disorder, Most Recent Episode Depressed, Severe Without Psychiatric Features."  Record 180.  He was prescribed medication and his GAF was assessed at 45.[1]  Record 181.  During the summer of 2006 the plaintiff continued to seek treatment at the Northwest Alabama Mental Health Center.  On June 22, 2006, a therapist noted the plaintiff called the previous week stating he was very depressed and unable to get his medications due to the cost.  The plaintiff had described himself as being "on the edge and ready to explode."  Record 173.  He reported not having slept in two days.  Record 173. The plaintiff reported that he had been out of his prescribed medications because he was unable to afford them.  His therapist suggested the plaintiff should attempt to be admitted

---

[1]  A GAF of 41-50 indicates:  "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV at 32 (emphasis in original).

2

through the emergency room "because he appeared to need medications to stabilize and I had every reason to believe he would continue to decompensate." Record 173. However, the plaintiff did not present for inpatient admission.

The plaintiff saw his psychiatrist on June 22, 2006. The psychiatrist increased his medications and indicated the plaintiff needed to get drug assistance in order to pay for his medicines. Record 173. The plaintiff saw his therapist on June 30, 2006, and reported that his depression was "cool." Record 171. The plaintiff admitted to smoking some "pot" while waiting to see the psychiatrist. Record 171. He reported that he was out of medications and the "pot" helped him while waiting to see his psychiatrist. Record 171.

On July 10, 2006, the plaintiff was seen by his therapist. He reported an onset of depressive mood beginning July 5, 2006, when he went to the restroom at work and started crying for no reason. Record 169. The plaintiff reported that later that night, he had gotten a gun and put it in his mouth, but a friend walked in and stopped him. Record 169. The plaintiff reported that he worked only one day the previous week and had been "locked up in the house" since July 5, 2006. Record 169. The plaintiff reported he was unable to concentrate at work and also had to resist impulses to hit people at work. Record 169. It was recommended that the plaintiff have an inpatient admission for crisis stabilization, and he was given a written statement for his supervisor at work to verify that he was medically unable to work during that week. Record 169. There is no record of the plaintiff's having been admitted for inpatient treatment.

On July 17, 2006, the plaintiff phoned the Mental Health Center reporting that he continued to suffer from high levels of depression.  Record 168.  The note indicates he was not suicidal, but was very depressed.  Record 168.  The note states that he phoned seeking a possible inpatient hospitalization for treatment.  The therapist's plan, however, was that he would be admitted to "PHP."[2]  On July 24, 2006, the plaintiff's therapist reported that he had begun PHP and was sleeping well after the adjustment of his medications on June 22, 2006.  Record 167.  However, the plaintiff stated that he had been unable to purchase the Depakote that he had been prescribed.  Record 167

On July 27, 2006, the plaintiff was noted to have been absent from PHP the previous day.  He had been attending as an "off record" client in order to determine if he would establish a record of attending before an official admission was made.  Record 166. He was given a random drug screen, which showed "positive results for most of the drugs that can be found by the screen."  Record 166.  The plaintiff only admitted to using "pot" several months previously.  He also admitted to using "Yellowjackets" the previous day. On July 31, 2006, the plaintiff saw Mr. Taylor at the Mental Health Center, who did not believe he had a sufficiently serious drug problem to warrant substance abuse treatment. Record 165.  However, the person in charge of the PHP program would not allow him in that program anymore.  Record 165.  This was the last time the plaintiff had contact with

---

[2]  Plaintiff described this program as lasting from 9 a.m. to 2 p.m. each day. Record 118.

the Mental Health Center in 2006. His case was ultimately terminated for failure to follow-up.

The plaintiff again sought treatment from the Northwest Alabama Mental Health Center on April 16, 2007. The plaintiff reported increasing problems with depression and a continuing difficulty sleeping. Record 157. The plaintiff reported "hearing people talking and I don't see anybody." Record 157. He also reported mood swings and episodes of increased irritability. Record 157. The plaintiff reported that he often sat in dark rooms and became very anxious when he was around more than a few people. Record 157. On examination the plaintiff exhibited a depressed mood and affect. It was recommended that he attend weekly men's group sessions, undergo psychiatric consultations and medication monitoring. At this time the plaintiff was diagnosed with "Bipolar I Disorder, Depressed, Severe with Psychiatric Features." Record 157. His GAF was assessed at 51.[3] Record 158. During this visit the plaintiff reported that he had taken Effexor in the past, which seemed to work for a few weeks. Record 157. However the plaintiff reported he had not taken Depakote, which had been prescribed, because he could not afford it. Record 157. On this visit the plaintiff's drug screen was negative. There are no other treatment notes in the record.

---

[3] A GAF rating of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)"  DSM-IV-TR at 34 (emphasis in original).

On June 16, 2007, the plaintiff was examined by Dr. Brian Thomas, a psychologist, at the request of the Social Security Administration.  On mental status examination the plaintiff had a dysphoric affect.  Record 183.  His mood was depressed and irritable.  Record 183.  Dr. Thomas diagnosed Bipolar Disorder, Not Otherwise Specified.  Record 184.   In the narrative section of his report, Dr. Thomas opined that plaintiff's "ability to perform routine and repetitive tasks appears fair though persistence in these activities is felt to be highly questionable."  Record 184.  Dr. Thomas opined that the plaintiff's "[a]bility to interact with coworkers and receive supervision appears limited."  Record 184.  Dr. Thomas believed the plaintiff's "ability to sustain attention appears fair at present."  Dr. Thomas opined the plaintiff's "[p]rognosis for improvement over the next six to twelve months appears poor."  Record 184.  Dr. Thomas believed the plaintiff's prognosis "might be improved somewhat if mental health treatment were sought."  Record 184.

In his RFC finding, the ALJ found as follows:

> [Plaintiff] has moderate limitations in his ability to maintain attention and concentration for extended periods, complete a normal work-day and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes....

Record 21.  Based upon the current record, the court is unable to determine whether substantial evidence supports the ALJ's RFC finding.

The level of symptoms reported by the plaintiff in the summer of 2006 would preclude work.  On May 12, 2006, the plaintiff's GAF score was assessed at 45.  As noted above, the score indicates the presence of a "**serious impairment in social, occupational... functioning** (e.g., no friends, unable to keep a job)."  DSM-IV at 32 (emphasis in original). The disabling severity of plaintiff's symptoms is confirmed by the treatment records of the Northwest Mental Health Center.  On more than one occasion inpatient mental health treatment was recommended.  Additionally, plaintiff's treating mental health provider on July 10, 2006, gave the plaintiff "a written statement for his plant supervisor to verify that he is medically unable to work this week (attached)...."  Record 169.  In spite of this abundant evidence of severe disabling symptoms, the ALJ in his decision stated that the plaintiff's mental health treatment "has been essentially routine and conservative in nature and has generally been successful in controlling his symptoms."  Record 22.  It is difficult to square this statement with the treatment records from the summer of 2006.  As outlined above, on more than one occasion those treating the plaintiff's bipolar disorder recommended admission for inpatient treatment and the plaintiff's treatment plan included daily outpatient treatment at in the mental health center's "PHP" program.  Such treatment is neither conservative nor routine.

From May through July 2006, the treatment records from the Mental Health Center show the plaintiff suffered mental limitations that would prevent work.  However, the record also indicates the plaintiff was using illegal drugs during that time.  Although the ALJ noted the plaintiff's history of drug use in his decision, he made no finding as to its

impact on his mental disease.  The plaintiff's drug use clearly had an impact on his

treatment at the mental health center because he was not allowed to continue in the "PHP"

program after his positive drug screen.  However, there is nothing in the medical record to

indicate to what extent the plaintiff's drug use exacerbated the symptoms he suffered

because of his bipolar disorder.  Because the medical record does not make clear the impact

plaintiff's drug use had on his symptomatology, the case must be remanded for further

development of the record.  On remand the Commissioner shall recontact the plaintiff's

treating mental health care professionals to determine their opinions as to the impact

plaintiff's drug use had on his symptomatology during the summer of 2006.

      The action must also be remanded for clarification of the report from

Commissioner's consultant, Dr. Thomas.  In his report Dr. Thomas indicated that the

plaintiff had only a "fair" ability to perform routine and repetitive tasks.  While it appears

the ALJ considered this to be an opinion that would allow the plaintiff to work, without an

explanation from Dr. Thomas, that is not the case.  The Tenth Circuit Court of Appeals has

found that under certain circumstances having a "fair ability" is the equivalent a "marked

limitation."  See, Cruse v. U.S. Dept. of Health & Human Services, 49 F.3d 614, 618 (10th

Cir. 1995).  In that case the court was construing a form submitted by the claimant's

doctors that indicated a "fair" ability in several areas.  Because the form defined "fair" to

mean "[a]bility to function in this area is seriously limited but not precluded," the court

concluded that having a "fair ability" was the equivalent of having a "marked limitation."

Id.  In the present case, the report of Dr. Thomas does not define fair.  Therefore, his report

might be construed to indicate the plaintiff had a marked limitation in his ability to perform routine and repetitive tasks.  Further clarification is also necessary  because Dr. Thomas believed plaintiff's ability to perform at even at a "fair level" on a persistent basis was "highly questionable."  Record 184.  On remand the Commissioner shall recontact Dr. Thomas for clarification.

## CONCLUSION

The ALJ failed to properly develop the record as to the extent of the limitations caused by plaintiff's mental illness.  The ALJ's failure to recontact both treating and consultative sources for clarification of their opinions leaves the court unable to determine whether the ALJ's RFC finding is supported by substantial evidence.  On remand the Commissioner shall properly develop the record as set out above.  Should additional examinations or hearings be necessary to allow the Commissioner to render an informed decision, they should be ordered.

DONE and ORDERED 27 January 2010.

_____

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.